IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 07–cv–01430–EWN

ALICE G. TABARES,

     Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

     Defendant.

_____

### ORDER AND MEMORANDUM OF DECISION
_____

     This is a social security benefits appeal.  Plaintiff Alice Tabares challenges the final decision of the Commissioner of Social Security (the "Commissioner"), denying her application for disability insurance benefits and supplemental security income.  Jurisdiction is premised upon 42 U.S.C. §§  405(g) and 1383(c)(3).

### FACTS

*1.*    *Factual Background*

     Plaintiff was born on January 18, 1947, and was fifty seven years old at the onset of her alleged disability in 2004.  (*See* Admin. R. at 61 [filed Sep. 14, 2007] [hereinafter "Admin. R."].)  Plaintiff has a high school education with some junior college classes and has worked in the banking industry from 1966 through 2004 and was laid off in January 2005.  (*See id*. at 54, 55–60, 80, 127.)  Plaintiff alleges she became unable to work beginning on December 17, 2004,

due to her conditions of diabetes, use of insulin, fibromyalgia, heart problems, being on oxygen at home and at night, left hip problem, and limited vision in her right eye.  (*See id.* at 61, 73.)

### a.    *Medical Evidence*

Plaintiff's medical record from her visits with her treating physicians[1] between December 2004 through 2006 reflects multiple health problems, including: (1) marked obesity; (2) sleep apnea; (3) degenerative disk disease and joint disease of her back; (4) mild atherosclerosis; (5) diabetes since 1999; (6) spinal stenosis; (7) peripheral neuropathy by physical examination; (8) possible diabetic retinopathy; (9) hyperlipidemia; (10) hypertension; (11) hematuria and proteinuria of unknown etiology; (12) history of right liver lesion and collapsed lung attributed to recurrent bronchitis; (13) osteopenia; (14) fibromyalgia; (15) gastroesophageal reflux disease ("GERD"); (16) mild coronary disease, with an ejection fraction of 58%; and (17) hepatitis A as a child.  (*See, e.g.*, Admin. R. at 157, 163, 166–67, 181, 198, 200, 242, 253, 261, 332.)

She has been taking a variety of medications to treat her multiple problems, including: Vicodin, Lantus, Metformin, Actos, Lipitor, Benicar, Metoprolol, Lipitor, Avalide, Aspirin, Calcium, Tylenol, Hydrocodone, Tramadol, Cyclobenzaprine, Celebrex, blood pressure medication, medication for heartburn, and Oxygen.  (*See, e.g., id..* at 197, 251, 264, 276–77, 281, 330.)  Plaintiff claims that the medications sometimes make her dizzy, and the painkillers make

---

[1] Plaintiff's treating physician list includes: Gordon Goodman, M.D., PH.D., Nampalli Vijay, M.D., Dr. Timothy Kennedy, M.D., Dr. Gilbert Maestas, M.D., Michael Tramutt, M.D., Jeffery Sabin, M.D., Philip Engen, M.D., David Wong, M.D., Robert Ballard, M.D., and Dr. Stanley Ginsburg, M.D.  (*See* Admin. R. *passim*.)  She was also treated by Jennifer Katz, a licensed acupuncturist.

her feel "woozie and in another world," or they put her to sleep. (Pl.'s Br. at 10 [citing Admin. R. at 103, 131, 350].)

Plaintiff has complained of hip and back pain, headaches, fatigue, swelling of hands and feet, weight gain, abdominal distress, frequent urination, depression, birthmarks, and thirst. (*See, e.g.,* Admin. R. at 274, 330.) Her surgical history includes: status post appendectomy, cholecystectomy, and laser photocoagulation of the left eye in 1996. (*See, e.g.*, *id.* at 166, 184.)

### i. *Pain*

Plaintiff has suffered from pain in the lower back, left hip, and buttock for about twenty five years, since she fell off a horse. (Admin. R. at 219.) "In December 2004 things got worse when she had an angiogram. She was not able to lie flat on her back for that long and when the procedure was over she started having severe left buttock pain." (*Id.* at 250 [Dr. Tramutt's Report].) The record indicates that Plaintiff's back pain has escalated since then. (*Compare*, *id.* at 238; *with id*. at 250, 255, 262, 264, 276.) On June 17, 2005, Dr. Tramutt of the Colorado Orthopedic Clinic described **Plaintiff's pain level as "7 out of 10 on the Pain Severity Scale," after taking Vicodin**. (Admin. R. at 250 [emphasis added].) Dr. Tramutt also recorded that Plaintiff "cannot walk or stand for long periods of time; sitting is fine." (*Id.*) When asked, during Plaintiff's visit with Dr. Tramutt, "[i]s your spinal problem so severe that you would consider surgery for some relief[,]" her response was "yes." (*Id*. at 257.)

Plaintiff "has had treatment with analgesic anti-inflammatory agents, muscle relaxants, activity modification, physiotherapy and epidural steroid without resolution." (*Id.* at 277 [Dr. Wong's Report]; *see also generally id.* at 250–51, 253, 262, 264, 266, 268, 270, 272, 285, 302.)

October 19, 2005, Dr. Timothy Kennedy reported to Dr. Gilbert Maestas, that Plaintiff "has been followed up by [Dr. Engen] in the pain clinic and she has had three steroid injections, which have had equivocal benefit." (*Id.* at 262.) Dr. Kennedy also reported that "Dr. Engen has raised the question that her fibromyalgia may be a substantial aggravating factor and raises the question of whether possible sleep apnea or other sleep disorder is an aggravating problem for her pain." (*Id.*)

Dr. Wong of the Denver Spine Clinic reported that: (1) Plaintiff did not get any relief from the epidural steroid injections; (2) "[s]he developed right lower extremity symptoms, after the third injection;" (3) "[s]he did undergo physical therapy one and a half years ago, and continued with exercise for a short time, but has not had any recent therapy or participated in therapeutic exercise. She does not feel that she can tolerate exercise currently. She has had sharply escalated pain over the last one month." (*Id.* at 276.) Dr. Wong described Plaintiff's symptoms as: "left posterior thigh and groin pain; bilateral low back pain; increased pain with stairs, walking; is occasionally awaken at night with pain; cannot sleep prone comfortably and uses a body pillow." (*Id.*)

On December 9, 2005, Dr. Wong had observed:

> At the present time the patient feels that her overall symptom level is about the same as it has been for months. She continues to have problems on a daily basis. She rates her day-to-day pain as between a 7, and a 10 out of 10 with 10 being the worst. Her pain is about an 8 today. Her symptoms are increased particularly by standing, walking, and climbing stairs. She has limited endurance for mechanical activities generally. She gets partial relief with rest. She is taking Hydrocodone, Tramadol and Cyclobenzaprine. She has had to limit her activities to a moderate degree, Level III. She has been off work about a year but not specifically because of her back problems.

(*Id.* at 277.)  He stated that the patient has "[m]ultifactorial symptom complex" and "she

primarily has mechanical back pain secondary to her multilevel degenerative changes," and

concluded that "as she primarily has back pain, increased on extension, and epidurals have not

been effective, I think the patient would be a candidate for facet blocks as both a diagnostic and

therapeutic procedure at this point.  She is going to contact Dr. Engen in this regard."  (*Id*. at

279.)

On December, 21, 2005, Dr. Engen reported that: (1) Plaintiff's "pain is burning, sharp

and shooting in nature and located across the lower back at midline and on the left and right

side;" (2) "in addition, the patient has associated radicular symptoms of burning, sharp pain and

shooting pain, radiating to the" right and left low back, right and left buttock, and right and left

posterior; and (3) "[t]he patient's symptoms also include muscle spasms."  (*Id*. at 266.)  Dr.

Engen noted that "the patient has had previous conservative treatment, previous treatment with

physical therapy and medication and two previous epidural steroid injections which provided

significant relief of symptoms," and that "the last treatment was December 2005."  (*Id*.; *see also

id.* at 268, 270, 272.)  Dr. Engen then concluded that "[d]ue to the nature of the patient's

significant pain and loss of function, facet block is recommended."  (*Id.*)  The facet block was

performed on that same day.  (*Id.*)  Plaintiff's pain was rated 7/10 prior to the procedure and

remained the same during and following the procedure.  (*Id.* at 267.)

Dr. Vijay's February 24, 2006 assessment and plan for the Plaintiff suggested that she:

"[g]et on a strict low-fat, low-cholesterol, low-calorie diet.  Get on an exercise program.  To get

a stress test done at the next visit.  She was unable to walk at the last visit [on 02/11/05] and states she is unable to walk at this time also.  We will do an adenosine or a Persantine test."  (*Id.* at 281.)

On May 15, 2006, Jennifer Katz, a licensed acupuncturist, reported:

Ms. Alice Tabares had acupuncture therapy with me on the following dates: 1/27/06, 2/3/06, 2/17/06.  I had recommended that Alice continue treatment bi-weekly but she was not able to due to finances.

Alice presented with disabling low back pain.  She had been diagnosed in 2004 with OA in the lumbar spine.  Her condition was not relieved by cortisone injections or an epidural.  Alice stated that she felt the pain 24/7, seated or when walking.  The pain referred into the left hip and wrapped around the front of the body to the psoas muscle.

Alice experienced slight relief from acupuncture but has continued to experience chronic pain in the left hip and left lower limb.  Alice did purchase a recumbent bike hoping that some regular non-compression exercise would help her condition.

In my phone conversation with Alice she has stated that her pain is severe and that she would like to continue acupuncture should her finances allow.  It was my impression of Alice's condition that it had slowed her down considerably and she was extremely concerned about her ability to return to work.

(*Id.* at 302.)  Plaintiff had a motor-vehicle accident on August 11, 2006.  (*See id.* at 330.)  On December 13, 2006, Plaintiff visited with Dr. Ginsburg who reported: "[t]he patient, although having had back difficulty previously, had marked aggravation of her back symptomatology with the addition of radicular symptoms subsequent to a motor-vehicle accident . . . .  She is receiving therapy now, and that should continue . . . .  I do think that we should have a recent MRI . . . ."

(*Id.* at 331.)  Plaintiff had an MRI and on January 24, 2007, Dr. Ginsburg reported:

She does have significant spinal stenosis at the L4–5 level, but as noted by the radiologist, because of transitional vertebrae being present, there is some confusion as to the exact level. She has very little radicular pain. Her primary problem is back pain which is markedly worse since the motor vehicle accident, but is primarily heft paralumbar with some bilateral radicular component. Most significantly, there is marked aggravation with standing and especially with walking, so she has reduced her walking markedly.

(*Id.* at 332.)

### ii. *Obstructive Sleep Apnea*

On October 19, 2005, Dr. Kennedy, reported that Plaintiff "has insomnia and some significant daytime hypersomnolence with an Epworth Sleepness Scale score that has gone up from 9 in 2003 to 14 today," and that "[s]he tries not to take naps but admits to naps with significant situations such as reading or TV or quite times," and that "[i]n spite of the fact that she tries not to avoid naps, she then says that she has trouble sleeping at night." (*Id.* at 262.)

A sleep center polysomnographic summary by Dr. Ballard of the National Jewish Medical Center, dated November 11, 2005, reports:

This study demonstrated poor sleep quality with a prolonged sleep latency, reduced sleep efficiency, and the absence of slow-wave sleep. During sleep there occurred moderate to loud snoring and mild sleep-disordered breathing, manifested by obstructive apneas and hypopneas that were observed predominantly during REM sleep and occurred late during the study (Obstructive Sleep Apnea Syndrome, ICSD Code 780.53-0).

(*Id.* at 304.) Dr. Ballard observed that Plaintiff's respiratory events were more problematic in the supine posture. (*Id.* at 304–05.)

### b. *Plaintiff's Work History and Daily Activities*

### i. *Work History*

Plaintiff was a Research adjustment clerk for First Interstate Bank, nka Wells Fargo, correcting customer errors in deposits. (*See* Admin. R. at 351.) She examined boxes of bank records for errors; boxed them up and shipped them to Houston. (*See id.* at 352–53.) This job required Plaintiff to take many trips to the basement, and lift and carry 25–50 pounds boxes of records, tapes, and computer printouts. (*See id.* at 75, 125, 353.)

She contends that her tasks required close attention to detail and other employees had been fined or terminated for errors. (*See id.* at 88.) Also, these tasks had deadlines that required Plaintiff to remain at work until they were completed. (*See id.* at 89.)

Plaintiff performed similar "Research adjustment work at Bankers Bank of the West R." (*See id.* at 88.) Plaintiff was last employed by Vectra Bank where she performed both desk work and tasks requiring her to stand to operate a stripping machine to read the bank codes on the bottom of checks, and lifting approximately five pounds. (*See id.* at 356–58.)

She testified that even though she still can mentally perform the banking work, she could not sit or stand long enough to perform. (*See id.* at 370.) Even though she was not laid off because of her alleged disability, Plaintiff also testified that at the time she was laid off she had fallen outside of work and at work because her feet would give out on her. (*See id.* at 373.) In addition, she was in constant pain, had fibromyalgia, and frequently visited her physicians. (*See id.*)

### ii.    *Daily Activities*

According to Plaintiff's description of her daily activities, taking a shower in the morning takes her longer due to the back pain. (*See* Admin. R. at 92.) She is out of breath after the

shower and sits down with oxygen while doing her hair. (*See id.* at 92–93.) She does not cook as often as she used to, and uses a microwave when she does. (*See id.* at 372.) She can no longer mop or scrub and does not clean as often either. (*See id.* at 272.) She vacuums one room at a time for about 10–15 minutes. (*See id.* at 372–73.) It takes her a couple of days to clean the house because she has to lay or sit down for awhile and take it up later or the next day. (*See id.* at 360.) Plaintiff used to sew, but cannot sit long enough at the sewing machine any longer. (*See id.* at 97, 362.)

She lays down 4–5 days during the week for 1 to 2 hours at a time. (*See id.* at 371–72.) She claims that sitting for very long brings pain to her back. (*See id.* at 98.) She estimates that she can sit for 15–20 minutes then has to get up and move around. (*See id.* at 362.) During the administrative hearing before the ALJ, she sat for about 30 minutes before she needed to stand up due to pain. (*See id.* at 370.) She takes a nap or sits to rest and read when she is in pain. (*See id.* at 94.) Plaintiff testified that she had five epidural injections that had not helped her pain. (*See id.* at 366.) She also testified that She took Tylenol and used heat and ice to reduce pain. (*See id.*)

She can walk half a block but then needs to rest. (*See id.* at 97– 98, 362.) She cannot walk to exercise. (*See id.* at 367.) She can lift and carry 15 pounds, but not very far. (*See id.* at 363–64). She has difficulty going up and down the stairs to the washer and dryer in the basement. (*See id.* at 360, 362–63.) She is not active in any groups, does not volunteer, and has no hobbies. (*See id.* at 370.)

### c.     State Agency Physician, Medical and Vocational Experts

### i.     State Agency Physician

On August 2, 2005, Dr. Karl Chambers, a State agency physician, reviewed the evidence and entered his assessment of Plaintiff's residual functional capacity. (*See id.* at 139–46.) The court notes that it appears that a part of Dr. Chambers' opinion in the residual functional capacity assessment form check boxes has been revised from lower to higher numbers. (*See id.*)

Dr. Chambers determined that Plaintiff, in an eight-hour workday, with normal breaks, could lift, carry, push, and/or pull 20 pounds (the original choice was 10 pounds) occasionally and 10 pounds (the original choice was "less than 10 pounds") frequently; stand and/or walk for a total of about 6 hours (the original choice was 3–4 hours); sit up to six hours, with postural shifts; frequently balance; occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; and should avoid concentrated exposure to extreme cold, wetness, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards such as heavy equipment, machinery, and unprotected heights. (*See id.* at 141–43.)

Dr. Chambers stated that Plaintiff's "allegations are considered credible and supported by objective medical findings." (*See id.* at 144.)

### ii..     Medical Expert

The following is a summary of Dr. Gale Humm's, a non-treating physician, testimony via telephone at the administrative hearing on June 12, 2006. (*See* Def.'s Resp. at 13–14; Admin. R. at 335.) She testified without hearing Plaintiff's testimony.

Dr. Humm testified that she had reviewed the medical evidence and that Plaintiff's condition did not meet or equal the requirements of any listed impairment. (*See id.* at 341–43.) She stated that Plaintiff, in an eight-hour workday, could not perform frequent lifting and/or carrying, but could lift, carry, push, and/or pull 20 pounds occasionally; sit for two hour intervals, with the ability to sit and stand, up to eight hours; stand and/or walk two hours collectively, each for 30 minutes at one time; and occasionally climb stairs, kneel, and balance, but never climb ladders, stoop, crouch, crawl, or work at heights or on scaffolds. (*See id.* at 344–46.) Dr. Humm testified that Plaintiff was not limited in the ability to reach, handle, and finger. (*See id.* at 346.) She stated that Plaintiff should not have concentrated exposure to dust, fumes, and chemicals or vibrations. (*See id.*)

Dr. Humm noted that the record contained evidence that Plaintiff had peripheral neuropathy of the feet, but this condition would not be expected to impact Plaintiff's functionality, as the medical evidence showed that it was primarily a sensory problem at the time. (*See id.* at 347.) She noted that Plaintiff had no recurring issues with coronary artery disease, but she was advised to have a stress test annually because of her risk factors. (*See id.* at 348.) Dr. Humm testified that Plaintiff was advised to lose weight and was not recommended for any surgeries. (*See id.* at 347.)

Dr. Humm testified that a diagnoses of sleep apnea was not confirmed in the record she received. (*See id.* at 348.) Dr. Humm testified that GERD is a very common diagnosis for obese people, and it rarely causes a work impairment. (*See id.* at 348.)

Dr. Humm stated that the medical evidence of record was "fairly consistent." (*See id.* at 347.) She stated that Plaintiff's obesity and other impairments impacted her functionality. (*See id.* at 343–44.) Dr. Humm testified that an obese person is susceptible to sleep apnea and that GERD, sleep apnea, and obesity could be treated and would not affect a person's ability to work. (*See id.* at 349.)

### iii. *Vocational Expert*

Pat Pauline, a vocational expert, who had reviewed the evidence and heard Plaintiff's testimony, completed a work history report and testified that Plaintiff's past relevant bank clerk jobs required sedentary exertion and her past work as a shipping clerk required medium exertion. (*See id.* at 379.)

The ALJ asked her to assume an individual with the following residual functional capacity: 20 pounds lifting and carrying; sit eight hours a day, two hours at a time; standing and walking collectively two hours out of eight, standing or walking 30 minutes at a time with postural shifts that do not require leave of the work station, occasional pushing and pulling of up to 20 pounds, no climbing ladders or scaffolds, stooping, crouching, crawling, or working at heights; no extensive concentrations of dusts, fumes, chemicals, or vibrations, but occasional balancing, climbing of stairs and kneeling. (*See id.* at 380.)

The vocational expert responded that a person with these limitations could perform Plaintiff's past relevant work as an accounting clerk, collections clerk, return item clerk, statement clerk, and data entry clerk, as those jobs are defined in the Dictionary of Occupational

Titles (DOT), U.S. Dep't of Labor, Dictionary of Occupational Titles (4th ed. 1991). (*See id.* at 380.)

The vocational expert also testified that an individual who needed extra work breaks could not work. (*See id.* at 381.)

## 2. *Procedural Background*

### a. *Administrative Proceedings*

On February 18, 2005, Plaintiff filed applications for Disability Insurance Benefits and for Supplemental Security Income benefits pursuant to 42 U.S.C.§ 405(g) and §1383(c)(3). (*See* Admin. R. at 18; Plaintiff-Appellant's Opening Br. [filed Nov. 26, 2007] [hereinafter "Pl.'s Br."] at 2.) On August 3, 2005, Plaintiff's claims were denied at the initial level. (*See* Admin. R. at 18; Pl.'s Br. at 2.) On October 6, 2005, Plaintiff requested a hearing. (*See* Admin. R. at 18; Pl.'s Br. at 2.) The hearing was held before an Administrative Law Judge ("ALJ"), on June 12, 2006, on the issue of disability. On September 18, 2006, the ALJ denied the disability claims at step four, and found that Plaintiff could return to her past relevant work. (*See* Admin. R. at 18; Pl.'s Br. at 2.) On May 24, 2007, the Appeals Council considered the additional evidence — Dr. Ginsburg's reports — presented by Plaintiff, and denied Plaintiff's request for review making the ALJ's decision the final decision of the Commissioner for the Social Security Administration. (*See* Pl.'s Br. at 2; Def.'s Resp. Br. [filed Dec. 28, 2007] [hereinafter "Def.'s Resp."] at 4.)

### b. *Procedural History on Appeal*

On July, 9, 2007, Plaintiff filed a complaint in this court challenging the Commissioner's denial of disability benefits. (Compl. [filed July 9, 2007].) On November 26, 2007, Plaintiff

filed her opening brief.  (Pl.'s Br.)  On December 28, 2007, the Commissioner filed a response.

(Def.'s Resp.)  On January 17, 2008, Plaintiff replied.  (Plaintiff-Appellant's Reply Br. [filed

Jan. 17, 2008] [hereinafter "Pl.'s Reply"].)

## ANALYSIS

### 1.      *Standard of Review*

Section 405(g) of the Social Security Act establishes the scope of this court's review of

the Commissioner's denial of disability insurance benefits.  *See* 42 U.S.C. § 1383(c)(3) (2008)

(incorporating review provisions of 42 U.S.C. § 405[g]).  Section 405(g) provides, in relevant

part, that:

> [t]he findings of the Commissioner of Social Security as to any
> fact, if supported by substantial evidence, shall be conclusive, and
> where a claim has been denied by the Commissioner of Social
> Security or a decision is rendered under subsection (b) of this
> section which is adverse to an individual who was a party to the
> hearing before the Commissioner of Social Security, because of
> failure of the claimant or such individual to submit proof in
> conformity with any regulation prescribed under subsection (a) of
> this section, the court shall review only the question of conformity
> with such regulations and the validity of such regulations.

42 U.S.C. § 405(g) (2006).  Thus, this court's review is limited to determining whether the

record as a whole contains substantial evidence supporting the Commissioner's decision.  *See*

*id.*; *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992).

> The reviewing court must review the record and consider: 1. The credibility
> findings made by the ALJ. 2. The plaintiff's vocational factors. 3. The medical
> evidence from treating and consulting physicians. 4. The plaintiff's subjective
> complaints relating to exertional and non-exertional activities and
> impairments. 5. Any corroboration by third parties of the plaintiff's
> impairments. 6. The testimony of vocational experts when required which is

> based upon a proper hypothetical question which sets forth the claimant's
> impairments.

*Nelson v. Astrue,* Civil No. 06-4298, 2008 WL 822157, *14 (D. Minn. Mar. 26, 2008) (citing

*Cruse v. Bowen*, 867 F.2d 1183, 1184–85 [8th Cir. 1989]). The court must uphold the

Commissioner's decision if it is supported by substantial evidence. *See Dollar v. Bowen*, 821

F.2d 530, 532 (10th Cir. 1987). This court cannot reweigh the evidence nor substitute its

judgment for that of the ALJ. *Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir. 1987). That

does not mean, however, that my review is merely cursory. To find that the ALJ's decision is

supported by substantial evidence, the record must include sufficient relevant evidence that a

reasonable person might deem adequate to support the ultimate conclusion. *Frey v. Bowen*, 816

F.2d 508, 512 (10th Cir. 1987). A decision is not based on substantial evidence if it is

overwhelmed by other evidence in the record or if there is a mere scintilla of evidence

supporting it. *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). The ALJ's decision is also

subject to reversal for application of the wrong legal standard. *Bernal v. Bowen*, 851 F.2d 297,

299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.

## 2.      *Evaluation of Disability*

### a.      *Legal Standard*

The qualifications for disability insurance benefits under the Social Security Act are that

the claimant meets the insured status requirements, is less than sixty-five years of age, and is

under a "disability." *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991). The Social Security

Act defines a disability as an inability "to engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A) (2006). In proving disability, a claimant must make a *prima facie* showing that she is unable to return to the prior work she has performed. *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988). Once the claimant meets that burden, the Commissioner must show that the claimant can do other work activities and that the national economy provides a significant number of jobs the claimant could perform. *Frey*, 816 F.2d at 512.

The Commissioner has established a five-step process to determine whether a claimant qualifies for disability-insurance benefits. *See* 20 C.F.R. § 404.1520 (2008); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987) (describing five-step analysis). A claimant may be declared disabled or not disabled at any step; and, upon such a determination, the subsequent steps may be disregarded. *See* 20 C.F.R. § 404.1520(a) (2008); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988). First, the claimant must demonstrate that she is not currently involved in any substantial gainful activity. 20 C.F.R. § 404.1520(b) (2008). Second, the claimant must show a medically severe impairment (or combination of impairments) which limits her physical or mental ability to do basic work activities. *Id.* § 404.1520(c). At the third step, if the impairment matches or is equivalent to established listings, then the claimant is judged conclusively disabled. *Id.* § 404.1520(d). If the claimant's impairments are not equivalent to the listings, the analysis proceeds to the fourth step. At this stage, the claimant must show that the impairment prevents her from performing work she has performed in the past. *See Williams*, 844 F.2d at 751

(citations omitted). If the claimant is able to perform his previous work, she is not disabled. 20 C.F.R. § 404.1520(f) (2008); *Williams*, 844 F.2d at 751. The fifth step requires the Commissioner to demonstrate that: (1) the claimant has the RFC to perform other work based on the claimant's age, education, past work experience; and (2) there is availability of that type of work in the national economy. *See* 20 C.F.R. § 404.1520(g) (2008); *Williams*, 844 F.2d at 751.

### b. *The ALJ's Findings*

In this case, at step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since her alleged onset date. (*See* Admin. R. at 21.) At steps two, the ALJ found that Plaintiff has the following severe impairments: diabetes mellitus, type II; peripheral neuropathy, hypertension, fibromyalgia, degenerative joint disease, cervical; degenerative joint disease, hip; cardiac problems; obesity; and sleep apnea. (*Id.*) The ALJ also found that Plaintiff has the following non-severe impairments: gastroesophageal reflux disease and depressive symptoms.

At step three, the ALJ determined that Plaintiff's above conditions do not meet or equal the requirements of any presumptively disabling listed impairment. (*See id.* at 21.) At step four, the ALJ found that Plaintiff retained the following residual functional capacity:

> the ability to perform work that does not require lifting and/or carrying more than 20 pounds occasionally or frequent lifting and/or carrying. Plaintiff has no limitations on sitting and may sit in two hour intervals for eight hours in an eight-hour workday. She can stand and/or walk for 30 minutes at a time for a combined time of two hours in an eight-hour workday, with positional shifts that do not require Plaintiff to leave the work station. Pushing/pulling may be done occasionally within weight limits. She may occasionally balance, climb stairs, and kneel, but she may not climb ladders or scaffolds, stoop, crouch,

crawl, work at heights, or work around concentrations of dust, fumes, chemical, or vibrations.

(*See id.* at 22.)  The ALJ found that Plaintiff could perform her past relevant work as an accounting clerk, collections clerk, return item clerk, statement clerk, and data entry clerk, as those jobs are defined in the DOT.  (*See id.* at 26–27.)  The ALJ concluded that Plaintiff was not disabled within the meaning of the Act.  (*See id.* at 27.)

In reaching the above mentioned conclusions, the ALJ gave "great weight to the opinion of Medical Expert Gail A. Humm, M.D." and "some weight to the opinions of the State Agency Reviewing Physician but note[d] that the reviewer did not have excess [sic] to all of the evidence," and stated that "[h]owever, it should also be noted that even with the new evidence received into the record, the claimant can still perform her past relevant jobs."  (*See id.* at 26.)

### i.    *The Credibility Determination*

The ALJ stated that:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effect of these symptoms are not entirely credible.  **The claimant complains of debilitating pain but is only taking over-the-counter Tylenol for pain**.

(*See id.* at 26 [emphasis added].)

### c.    *Plaintiff's Arguments on Appeal*

Plaintiff sets forth three arguments in support of her contention that the ALJ's decision was erroneous.  Plaintiff argues the ALJ erred in: (1) "evaluating the Claimant's impairments of sleep apnea and obesity;" (2) "failing to state with particularity the weight he gave to the treating

doctors medical opinions;" and (3) "the evaluation of Claimant's pain." (Pl's Br. at 5.)

### i. *The Weight Given to the Treating Physicians' Opinions*

A claimant must provide medical evidence that he or she had an impairment and how severe it was during the time the claimant alleges they were disabled. 20 C.F.R. §§ 404.1512(c) and 416.912(c). The evidence that a claimant has an impairment must come from acceptable medical sources including licensed physicians or psychologists. 20 C.F.R. §§ 404.1513(a) and 416.913(a). Evidence from other medical sources, including therapists, nurse-practitioners, and physicians' assistants, may be used to show the severity of an impairment and how it affects the ability to work. 20 C.F.R. §§ 404.1513(d)(1) and 416.913(d)(1).

In the instant case, as the record indicates, Plaintiff has provided opinions of acceptable medical and non-medical sources to show the existence and severity of her impairments. *See* Facts § 1a *supra*. The ALJ determination of Plaintiff's severe and non-severe impairments is consistent with Plaintiff's treating physicians' opinion. (*Compare*, Facts § 1a *supra*; *with* Admin. R. at 20–21.)

"An ALJ is required to give controlling weight to a treating physician's well-supported opinion, so long as it is not inconsistent with other substantial evidence in the record." *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001). Only, "[w]hen an ALJ rejects the opinion of a treating source, he may credit the opinion of a non-examining source instead." *Nelson,* 2008 WL 822157, *16 (citing *Hacker v. Barnhart*, 459 F.3d 934, 936 [8th Cir. 2006]).

In this case, the ALJ stated that he is giving great weight to the medical expert (a non-treating non-examining witness via telephone) and some weight to the state agency physician's

opinion.  (*See* Admin. R. at 26.)  However, the ALJ does not explain why he is not giving any weight to the treating physician's opinions, even though he includes a selection of pieces of their opinions in his decision, and especially where both the state agency physician and medical expert agreed that Plaintiff's treating physicians' opinions are consistent and the state physician stated that Plaintiff's statements were credible and consistent with her physicians' objective findings.  (*See* Admin. R. at 144, 347.)

Accordingly, on remand, the ALJ must address this issue and also include Dr. Ginsburg's opinion, as it is now part of the medical record.  *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994) (stating that any new evidence submitted to the Appeals Council on review "becomes part of the administrative record to be considered when evaluating the Secretary's decision for substantial evidence"); *see also Blea v. Barnhart*, 466 F.3d 903, 913 (10th Cir. 2006).

### ii.      *Evaluation of Plaintiff's Pain*

In assessing a claimant's RFC, the ALJ must consider any medical opinions regarding the claimant's limitations, "as well as the claimant's own testimony concerning her limitations." *Wyatt v. Barnhart*, 190 F. App'x 730, 734 (10th Cir. 2006); 20 C.F.R. § 404.1545(a)(3) (2008). In order to properly analyze the evidence of pain the Commissioner must consider "(1) whether claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a 'loose nexus' between the proven impairment and the claimant's subjective allegations of pain; and (3) if so, whether considering all the evidence, both objective and subjective, claimant's pain is in fact disabling."  *Kepler v. Chater*, 68 F.3d 387, 390–91 (10th Cir.1995).

If an impairment is reasonably expected to produce some pain, allegations of disabling pain emanating from that impairment are sufficiently consistent to require consideration of all relevant evidence.  For example, an impairment likely to produce some back pain may reasonably be expected to produce severe back pain in a particular claimant.  *Luna*, 834 F.2d at 164.  Symptoms can sometimes suggest a greater severity of impairment than is demonstrated by objective and medical findings alone. Direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced.  *Luna*, 834 F.2d at 165. The absence of an objective medical basis for the degree of severity of pain may affect the weight to be given to the claimant's subjective allegations of pain, but a lack of objective corroboration of the pain's severity cannot justify disregarding those allegations. When determining the credibility of pain testimony the ALJ should consider the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.  *Thompson*, 987 F.2d at 1489.

*Hearlson v. Astrue*, No. 06-1120-JTM, 2007 WL 2900274, *1 (D. Kan. Aug. 29, 2007).

In the instant case, the ALJ has failed to perform the proper analysis required by the Tenth Circuit.  The ALJ states that even though "claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms," "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  (*See* Admin. R. at 26.)  In concluding so, the ALJ's sole reason is that "[t]he claimant complains of debilitating pain but is only taking over-the-counter Tylenol for pain."  (*Id.*)  Such reasoning completely disregards the record replete with Plaintiff's efforts to obtain relief of her pain — all without success — and her treating physician's reports in confirmation, *see* Facts § 1ai *supra*, and contradicts even the state agency physician's finding that Plaintiff's statements

are credible and consistent with her physician's objective findings and both his and the medical expert's findings that Plaintiff's treating physicians' opinions consistent. "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Kepler,* 68 F.3d at 391; *see also Teter v. Heckler,* 775 F.2d 1104, 1106 (10th Cir.1985) (holding that where other evidence corroborates claimant's pain as genuine, ALJ may not reject claimant's allegations solely on basis of his demeanor); *Liter v. Apfel*, No. CIV. A. 00-2231-KHV, 2001 WL 304046, *8 (D. Kan. Feb. 16, 2001) (citing Social Security Ruling 96–7p, 61 Fed.Reg. 34483, 34487 [S.S.A. July 2, 1996] ["Persistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medications, trials of a variety of treatment modalities in an attempt to find one that works or that does not have side effects, referrals to specialists, or changing treatment sources may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms."]).

Moreover, the vocational expert testified that an individual who needed extra work breaks could not work. (*See id.* at 381.) The record indicates that according to Plaintiff (whose credibility has not been questioned by any of the treating or non-treating physicians) she needs to take long breaks due to the pain. (*See*, *e.g.*, *id.* at 92, 277.) Accordingly, the court finds that the ALJ's finding is not supported by the record and remands this issue in order for the ALJ to properly consider the medical evidence, analyze the evidence of pain as noted above, and also conduct a new credibility analysis in light of the medical evidence from the treating and examining medical sources, including Dr. Ginsburg.

### iii.    Evaluation of Plaintiff's Sleep Apnea and Obesity

Plaintiff also argues that the ALJ failed to make proper findings regarding her limitations caused by obesity and sleep apnea.  The record demonstrates that Plaintiff sought relief from her sleep apnea, but could not afford more tests.  (*See, e.g., id.* at 368.)

"Subjective complaints such as fatigue are generally analyzed under the same standard as complaints of pain."  *Liter*, 2001 WL 304046 at *6 (siting *Holt v. Sullivan*, 921 F.2d 1221, 1223 [11th Cir. 1991]; *Jackson v. Bowen*, 873 F.2d 1111, 1114 [8th Cir.1989].).  "The medical community has not developed a simple laboratory test for daytime drowsiness.  Accordingly, a claimant's uncontested testimony may not be rejected simply because it has not been proven conclusively in a laboratory setting."  *Id.* at *8 (citing *Sisco v. United States Dep't of HHS*, 10 F.3d 739, 744 [10th Cir. 1993]).  At step two, the ALJ determines that Plaintiff suffers from severe impairments of sleep apnea and obesity, however both his decision and the medical expert's opinion (which the ALJ gave great weight) are silent as to the impact of these severe impairments, separately, and/or in combination, on Plaintiff's ability to perform sedentary tasks. (*See* Admin. R. at 20–28, 340–49.)  In fact, in determining Plaintiff's residual functional capacity, the medical expert's only analysis of the effect of Plaintiff's severe impairment obesity and sleep apnea on her ability to perform the sedentary tasks is this one sentence that "an obese person is susceptible to sleep apnea and that GERD, sleep apnea, and obesity could be treated and would not affect a person's ability to work."[2]  (*See id.* at 349.)

---

[2] The court notes that neither the medical expert nor the ALJ claim that Plaintiff failed to follow any treatment prescribed by Plaintiff's treating physicians.

Neither the medical expert nor the ALJ, however, provide any authority or information regarding these allegedly available treatments and explain how, based on the record, they could relieve Plaintiff's multiple severe impairments. (*See id*. at 20–28, 340–49.) "[A] Social Security disability hearing is a nonadversarial proceeding, in which the ALJ has a basic duty of inquiry, to inform himself about facts relevant to his decision and to learn the claimant's own version of those facts." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992) (citations and internal quotation mark omitted).

Similarly:

> Obesity by itself does not mean the claimant has refused treatment. *McCall v. Bowen*, 846 F.2d 1317, 1319 (11th Cir.1988). Nor does a physician's recommendation to lose weight necessarily constitute a prescribed course of conduct. *Id*. The Fifth Circuit has said this about assuming obesity to be remediable: In like disregard of reality, the Secretary continues to hold that a person who is disabled because of obesity has a condition that is *per se* remediable, without examining the medical condition and personal factors that might make it possible or impossible for a particular disabled person to remedy his obesity. As we held in *Scott v. Heckler,* 770 F.2d 482, 486–87 (5th Cir.1985): Significant weight loss is indeed difficult even for the iron willed. For the less determined, who suffer from other painful and debilitating impairments that restrict movement, and no doubt sap the resolve for self-improvement, such a significant loss of weight may be impossible. Alcoholism may be considered a disabling impairment despite the fact that a doctor has ordered the alcoholic to stop drinking. Whether or not [the claimant] has the ability to control [his] eating habits is at least a fact question, not a matter to be determined by a priori judgment, for certain impairments, although initially self-inflicted, may become diseases that either contribute to an overall disability or are of themselves disabling. *Lovelace v. Bowen,* 813 F.2d 55, 59 (5th Cir.1987).

*Graham v. Sullivan,* 794 F. Supp. 1045, 1052–53 (D. Kan. 1992). In this instance, like *Graham*, the ALJ did not consider any of the above factors. "Without these findings and evidence to

support them, the ALJ may not summarily conclude the plaintiff's weight condition is remediable." *Id*. at 1053.

Moreover, according to the social security regulations "the agency 'will not make assumptions about the severity or functional effects of obesity combined with other impairments' because '[o]besity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment.'" *Hamby v. Astrue*, 260 Fed. App'x 108, 112 (10th Cir. 2008) (citing Soc. Sec. R. 02-1p, "Titles II and XVI: Evaluation of Obesity," 2000 WL 628049, at *6.). Each case will be evaluated "based on the information in the case record." *Id.* In this case, the ALJ failed to give adequate consideration to the effect of Plaintiff's obesity, separately, or in combination with her other severe impairments, and provided no discussion of the effect of obesity on Plaintiff's other severe impairments. Therefore, the court finds that, once again, the ALJ has applied incorrect legal standards and failed to articulate his reasoning with sufficient specificity.

## 4. Conclusion

In step two of his decision, the ALJ concluded that Plaintiff had many severe impairments. However, similar to the ALJ in *Hamby*, he failed to consider the consequences of these impairments in determining that Plaintiff had the RFC to perform a wide range of sedentary work. *See Hamby,* 260 Fed. App'x at 112. Moreover, as mentioned above, the ALJ sought out and accepted the VE's testimony as valid, but did not properly interpret and apply his testimony. *See Hayden v. Barnhart*, 374 F.3d 986, 991 (10th Cir. 2004).

Based on the foregoing, the court finds that the ALJ's RFC determination and his corresponding credibility findings contain legal flaws.  It is therefore ORDERED that the Commissioner's decision is REVERSED and REMANDED for proceedings consistent with this opinion.

Dated this 29th day of September, 2008.

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge